ROYAL PROPERTY GROUP, LLC v PRIME INSURANCE
SYNDICATE, INC

Docket No. 249043. Submitted April 6, 2005, at Detroit. Decided August
23, 2005, at 9:05 a.m.

. Royal Property Group, LLC, brought an action in the Wayne Circuit
Court against Prime Insurance Syndicate, Inc., a surplus lines
insurer; and Whitcomb and Company, Inc., a licensed insurance
agent, seeking payment up to the policy limit for fire damage to a
building insured by Prime and owned and coinsured by Royal. The
circuit court, Daphne Means Curtis, J., granted summary disposi-
tion for Royal against Prime and entered a judgment for Royal,
having ruled that the policy was ambiguous with respect to the
method of valuation to be used to determine coinsurance liability.
Prime appealed.

The Court of Appeals *held*:

The trial court erred in granting summary disposition and
entering judgment for Royal.

1. With regard to coinsurance, there is no ambiguity in the
policy. Reading the policy as a whole, there is only one reasonable
interpretation of the policy. The policy measures an insured's
coinsurance liability using the replacement cost value of the
property while limiting the insurance company's liability to the
actual cash value of the loss. The coinsurance clause within the
policy is very specific, including several examples, and is consistent
with the policy application and the declarations page of the policy.

2. Royal had the opportunity and duty to read the policy. The
Court would have to reform the policy to give Royal the relief it
sought, rather than merely interpret the contract. The Court will
not make a new contract of insurance for the parties under the
guise of construing the contract. In this case, the Court can only
enforce the contract as it is written.

3. Michigan's public policy does not prohibit an insurer from
issuing a policy of insurance that measures an insured's coinsur-
ance liability using the replacement cost value of the property
while limiting the insurer's liability to the actual cash value of the
loss. A contract that violates Michigan's public policy is unenforce-

able. But, public policy is rooted in law, not the preferences of any court. Coinsurance clauses are enforceable in Michigan. The contract is not illusory, and the lower court record does not illustrate that Prime's business practices are fraudulent or deceptive. Additionally, Prime's status as a surplus lines insurance carrier supports the conclusion that Royal is not entitled to relief on public policy grounds.

Reversed and remanded for grant of summary disposition for Prime.

INSURANCE — COMMERCIAL PROPERTY — PROPERTY DAMAGE — COINSURANCE LIABILITY BASES.

A commercial property damage policy may measure an insured's coinsurance liability using the replacement cost value of the property while limiting the insurance company's liability to the actual cash value of the loss.

*Duncan M. Szymanski* for Royal Property Group, LLC.

*Grotefeld & Denenberg, L.L.C.* (by *Jeffrey R. Learned*), for Prime Insurance Syndicate, Inc.

*Sills, Charboneau, Fiedler & Barnett, P.C.* (by *Thomas R. Charboneau, Jr.*), for Whitcomb & Company, Inc.

Before: WHITBECK, C.J., and ZAHRA and OWENS, JJ.

ZAHRA, J. In this insurance case, defendant insurer, Prime Insurance Syndicate, Inc. (Prime), appeals as of right the trial court's entry of judgment in favor of plaintiff insured, Royal Property Group, LLC (Royal), for $228,729.84. The significant issues in this case are (1) whether the insurance policy is ambiguous in regard to the method of valuation used to determine coinsurance liability and (2) whether a coinsurance clause that determines an insured's coinsurance liability on the basis of the *replacement cost value* (RCV) of the property is against public policy where an insurer's liability is limited to the *actual cash value* (ACV) of the loss. Reading the policy as a whole, we hold that there is but

one reasonable interpretation of the policy. The insured's coinsurance obligation is based on the RCV of the property and the insurer's limit of liability is based on the ACV of the loss. We further hold that Michigan's public policy does not prohibit an insurer from issuing a policy of insurance that measures an insured's coinsurance liability using the RCV of the property while limiting its liability to the ACV of the loss. We reverse the trial court's order granting Royal partial summary disposition, and remand with instructions that summary disposition be granted to Prime.

### I. BASIC FACTS AND PROCEEDINGS

Royal, through its agent, defendant Whitcomb & Company, Inc., applied for commercial property insurance from Prime to cover three apartment buildings that Royal owned and operated in the city of Detroit. The coverage for "Building 2" is at issue in this case. In regard to Building 2, the policy application contains the following section:[1]

| SUB-JECT OF IN-SUR-ANCE | AMOUNT | COINS % | VALU-ATION | CAUSES OF LOSS | INFLA-TION GUARD % | DE-DUCT-IBLE | FORMS AND CONDI-TIONS TO AP-PLY |
|---|---|---|---|---|---|---|---|
| **Bldg** | **600,000** | **80** | **ACV** | **Special** | | **1500** | **Excl theft** |
| Loss of Rents | **156,000** | **12 months** | **ACV** | **Special** | | **1500** | **Excl theft** |

Prime later issued a policy to Royal. The declarations page of the policy contains a section titled, "COVER-

---

[1] This is not an actual reproduction of the table contained in the policy application, though it reflects its form and content. The handwritten entries on the policy application are emphasized in bold.

AGES PROVIDED—INSURANCE AT THE DE-
SCRIBED PREMISES FOR COVERAGES FOR
WHICH A LIMIT OF INSURANCE IS SHOWN,"
which provides in regard to Building 2:[2]

| PREM. NO. | BLDG. NO. | COVER-AGE | LIMIT OF IN-SUR-ANCE | COV-ERED CAUSES OF LOSS | COINSUR-ANCE % | RATES |
|---|---|---|---|---|---|---|
| 2 | 1 | BUILD-ING | 600,000 | BROAD-ACV | 80 | .81 |
| 2 | 1 | BUS. INC. | 156,000 | BROAD-ACV | 1/3 | .81 |

In a section titled, "ADDITIONAL CONDITIONS,"
the policy states:

The following conditions apply in addition to the Cov-
erage Conditions and the Loss Conditions.

1. Coinsurance

A Coinsurance percentage of 80% applies to this policy.

a. We will not pay the full amount of any loss if the
replacement cost value of Covered Property at the time of
loss multiplied by the 80% Coinsurance percentage shown
for it in the Declarations is greater than the limit of
insurance for the property.

Instead we will determine the most we will pay using
the following steps:

(1) multiply the replacement cost value of covered
property at the time of loss by the coinsurance percentage;

(2) divide the limit of insurance of the property by the
figure determined in step (1);

(3) multiple the total amount of loss, before the appli-
cation of any deductible, by the figure determined in step
(2); and

---

[2] This is not an actual reproduction of the table contained in the
declarations page of the policy, though it reflects its form and content.
The hand-typed entries on the declarations page are emphasized in bold.

(4) subtract the deductible from the figure determined in step (3).

We will pay the amount determined in step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

Three detailed examples are provided that show how the coinsurance clause operates when the sum of the RCV of the covered property and the coinsurance percentage is more than (underinsurance), less than (overinsurance), and equal to (adequate insurance) the amount of the policy limit.

Building 2 was destroyed in a fire on April 16, 2002. At the time of the fire, Building 2 had an ACV of between $814,270 and $1,280,769, and an RCV of $3,659,396. Prime paid out $372,270.16 under the policy.[3] Royal disputed the amount of the payment and claimed that Prime reduced its payment by improperly applying the coinsurance clause.

Royal filed this action to recover the policy limit. In Royal's view, the policy application and the declarations page of the policy require the coinsurance clause be construed to state "actual cash value" instead of "replacement cost value." Under this formulation, the ACV of the loss would exceed the policy limit of $600,000 and would entitle Royal to the policy limit.

Prime moved for partial summary disposition, arguing that it had properly applied the coinsurance clause to reduce Royal's recovery. After holding a hearing, the trial court concluded that the notations on the declarations page of the policy rendered the policy ambiguous in regard to coinsurance liability. The trial court denied

---

[3] Part of this payment ($105,270.08) went to the city of Detroit to cover demolition costs.

Prime's motion for summary disposition and ordered that summary disposition be issued in favor of Royal.[4] The trial court subsequently granted Royal's motion for entry of final judgment and ordered that Prime pay Royal an additional $228,729.84. This appeal ensued.

## II. OPERATION OF THE COINSURANCE CLAUSE

### A. STANDARD OF REVIEW

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is appropriate under MCR 2.116(C)(10) when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Accordingly, when deciding a motion under MCR 2.116(C)(10), this Court reviews "the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004).

Further, resolution of this issue depends on interpretation of the insurance policy, which is also reviewed de novo. *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 47;

---

[4] Royal did not move for summary disposition. The trial court exercised its authority under MCR 2.116(I)(2) to render judgment in favor of Royal when resolving Prime's motion for summary disposition.

664 NW2d 776 (2003). "Similarly, whether contract language is ambiguous is a question of law that we review de novo." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003), citing *Farm Bureau Mut Ins Co v Nikkel*, 460 Mich 558, 563; 596 NW2d 915 (1999).

### B. ANALYSIS

"An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992), citing *Eghotz v Creech*, 365 Mich 527, 530; 113 NW2d 815 (1962).[5] "[I]nsurance polices *are* subject to the same contract construction principles that apply to any other species of contract." *Rory v Continental Ins Co*, 473 Mich 457, 461; 703 NW2d 23 (2005) (emphasis in original). " 'The primary goal in the construction or interpretation of a contract is to honor the intent of the parties[.]' " *Klapp, supra* at 473, quoting *Rasheed v Chrysler Corp*, 445 Mich 109, 127 n 28; 517 NW2d 19 (1994). "[T]he language of the parties' contract is the best way to determine what the parties intended." *Klapp, supra* at 476.

---

[5] The insurance policy contains a choice-of-law clause that provides, "The provisions of this policy are to be construed in accordance with the laws of the State of Illinois, as the state in which the policy has been entered." However, neither party has raised the choice-of-law issue, and the trial court's decision was based solely on Michigan law. We have unilaterally surveyed Illinois law. Illinois rules of insurance policy interpretation are substantially similar to those of Michigan. Compare *Hobbs v Hartford Ins Co of the Midwest*, 214 Ill 2d 11, 17-18, 20-25; 823 NE2d 561 (2005), with *Klapp, supra* at 467, 469-476, and *Churchman, supra* at 566-567. The conclusion we reach in regard to the application for the policy and the interpretation of the coinsurance clause is the same under Michigan law and Illinois law. See page 722-723.

Accordingly, an insurance contract should be read as a whole and meaning should be given to all terms. *Wilkie, supra* at 50 n 11. The policy application, declarations page of policy, and the policy itself construed together constitute the contract. *Hall v Equitable Life Assurance Society of the United States*, 295 Mich 404, 408; 295 NW 204 (1940).[6] The contractual language is to be given its ordinary and plain meaning. *Id.* at 408. An insurance contract must be construed so as to give effect to every word, clause, and phrase, and a construction should be avoided that would render any part of the contract surplusage or nugatory. *Klapp, supra* at 467. "[U]nless a contract provision violates law or one of the traditional [contract] defenses to the enforceability of a contract applies, a court must construe and apply unambiguous contract provisions as written." *Rory, supra* at 461. "[T]he judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provisions." *Id.* A provision in a contract is ambiguous if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning. *Lansing Mayor v Pub Service Comm*, 470 Mich 154, 165 n 6, 166; 680 NW2d 840 (2004).

"The term 'coinsurance' means a relative division of the risk between the insurer and the insured." 15 Couch, Insurance 3d, § 220:3, p 220-8. "Coinsurance

---

[6] The declarations page is generally considered part of the insurance policy. See 1 Appleman, Insurance 2d, § 4.4, p 417. Also, the instant policy expressly provides that the " 'Application' . . . form[] [is] part of the policy."

clauses are provisions in insurance policies that require the insured to maintain coverage to a specified value of the property, and stipulate that, upon his or her failure to do so, he or she becomes a coinsurer and must bear his or her proportionate part of the loss." *Id.* at 220-9. As one court explained, "That [coinsurance] clause does not undertake to define the nature of the insurer's liability; its role, instead, is simply to decrease that liability if the demand specified in the clause is not met." *Carley Capital Group v Fireman's Fund Ins Co*, 278 US App DC 143; 877 F2d 78, 82 (1989).

The crux of Royal's claim is that the parties intended that the coinsurance be based on the ACV of the property. In support, Royal cites the portions of the policy application and the declarations page of the policy, claiming that they suggest that the coinsurance percentage is based on the ACV of the property. Royal adds that nowhere on the policy application or the declarations page is there any indication that coinsurance would be determined by the RCV of the property. Royal then argues that because the coinsurance clause in the policy states that coinsurance is applied using the RCV of the property, it irreconcilably conflicts with the policy application and the declarations page. Royal concludes that this conflict presents an ambiguity that must be interpreted in its favor because (1) the entries on the policy application and the declarations page are not printed and, thus, control over the printed coinsurance clause contained in the policy, see *Martin v Ohio Cas Ins Co*, 9 Mich App 598, 601-602; 157 NW2d 827 (1968), and (2) ambiguities in an insurance policy are construed in favor of the insured (the rule of *contra proferentem*), see *Klapp, supra* at 470-471.

The trial court concluded that the policy was ambiguous with respect to coinsurance because the declara-

tions page of the policy conflicted with the coinsurance clause. The trial court did not mention the policy application. The trial court's conclusion is predicated on a finding that the declarations page states that coinsurance would be based on the ACV of the property. However, nowhere on the declarations page does it state that the 80 percent coinsurance requirement would be based on the ACV of the property. The only information related to coinsurance is the entry "80" under the heading "Coinsurance %." Royal argues that the "Broad-ACV" entry under "Covered Causes of Loss" heading on the declarations page of the policy shows that coinsurance would be determined on an ACV basis. However, the "Broad-ACV" entry clearly refers to the portion of the policy entitled, "Causes of Loss—Broad Form." The form begins by stating that "[w]hen Broad is shown in the Declarations, Covered Causes of Loss means the following . . . . " The form then delineates several causes of accidents covered and not covered by the policy. Nothing in this form refers to coinsurance, and, thus, there is no basis to infer that the declarations page indicates that the parties intended coinsurance be based on ACV. Therefore, we conclude that the trial court erred in finding the declarations page expressed that coinsurance would be determined on an ACV basis.

Royal also claims that the policy application indicates that coinsurance would be determined on the basis of the ACV of the property. Again, however, the only information related to coinsurance is the entry "80" under the heading "Coins %." Royal specifically argues that the "ACV" entry under the "Valuation" heading of the policy application shows that coinsurance would be calculated on an ACV basis. However, the headings and respective entries in this section are separated by columns, and there is no indication on the policy application that the "ACV" entry supplements the

"Coins %" heading. Accordingly, there is no basis to assume that the parties intended that coinsurance would be based on the ACV of the property. In sum, we find that Royal's interpretation of the policy application and the declarations page of the policy is unduly strained. *Radenbaugh v Farm Bureau Gen Ins Co of Michigan*, 240 Mich App 134, 138; 610 NW2d 272 (2000), citing *Hosking v State Farm Mut Automobile Ins Co*, 198 Mich App 632, 633-634; 499 NW2d 436 (1993).

Further, we conclude that Royal's construction of the policy overemphasizes the policy application and the declarations page of the policy. Our Supreme Court has not specifically addressed the weight to be given an insurance policy application or the declarations page of an insurance policy. However, we agree with a recent opinion by the Illinois Supreme Court, which stated:

> The declarations page is but one piece of the insuring agreement. Although it contains important information specific to the policyholder, the declarations page cannot address every conceivable coverage issue. Thus, some uncertainty could arise if the declarations page is read in isolation from the rest of the agreement. [*Hobbs v Hartford Ins Co of the Midwest*, 214 Ill 2d 11, 23; 823 NE2d 561 (2005), citing *Zurich Ins Co v Raymark Industries, Inc*, 118 Ill 23, 50; 514 NE2d 150 (1987) (citation omitted).]

We also extend this rationale to a policy application that is deemed part of the insurance policy. " 'Any provision of a lengthy document is bound to be ambiguous in the sense that it creates questions that can be answered only by reference to other portions of the document.' " *Hobbs, supra* at 23, quoting *In re Estate of Striplin*, 347 Ill App 3d 700, 706; 807 NE2d 1255 (2004). Here, the same can be said of the declarations page and the policy application. They are only parts of the insurance policy, and should not be read in isolation from the policy because uncertainty or ambiguity could arise. Thus, we

agree with the observation of the Supreme Court of Illinois that "[t]his is precisely why an insurance policy must be interpreted from an examination of the complete document." *Hobbs, supra* at 23, citing *Zurich, supra.*

In regard to coinsurance, we conclude that there is no ambiguity. Neither the policy application nor the declarations page of the policy addresses the operation of coinsurance, except to indicate a percentage that would be integrated in the coinsurance clause. The coinsurance clause, however, is very specific, providing in part:

> We will not pay the full amount of any loss if the replacement cost value of Covered Property at the time of loss multiplied by the 80% Coinsurance percentage shown for it in the Declarations is greater than the limit of insurance for the property.

This Court is required to read contracts as a whole, giving harmonious effect, if possible, to each word and phrase. *Wilkie, supra* at 50 n 11, citing *Singer v Goff,* 334 Mich 163, 168, 54 NW2d 290 (1952). Also, specific provisions normally override general ones. *Sobel v Steelcraft Piston Ring Sales, Inc,* 294 Mich 211, 219; 292 NW 863 (1940); *Haefele v Meijer, Inc,* 165 Mich App 485, 498; 418 NW2d 900 (1987), remanded on other grounds 431 Mich 853 (1988).

Here, the coinsurance clause specifically addresses the operation of coinsurance. Further, the language of the coinsurance clause is consistent with the policy application and the declarations page of the policy. The coinsurance percentage listed in each of those documents, 80 percent, is the same percentage stated in the coinsurance clause. Therefore, because the coinsurance clause specifically addresses the operation of coinsurance in a manner consistent with the policy application and declarations page, the clause must be enforced as

written. *Rory, supra.* The trial court improperly created an ambiguity by accepting Royal's strained interpretation of the policy application and the declarations page and then finding Royal's interpretation inconsistent with the coinsurance clause within the policy. *VanDyke v League Gen Ins Co*, 184 Mich App 271, 275; 457 NW2d 141 (1990), citing *Farm Bureau Mut Ins Co of Michigan v Hoag*, 136 Mich App 326, 332; 356 NW2d 630 (1984).

Royal's claim on appeal suggests that it was led to believe that coinsurance would only require them to insure the property to 80 percent of its ACV. However, such a claim does not require the policy to be interpreted; rather, the claim requires the policy to be reformed.[7] Neither the litigants nor the trial court

---

[7] 5 Corbin, Contracts (1998 rev ed), § 24.18, pp 174-175, provides:

A party who seeks judicial reformation of a written contract usually asserts that the written words do not express to others the meaning that both parties had intended. The request for reformation is therefore a request that the court alter the words of the document. This alteration may involve deleting words or punctuation, rearranging words or punctuation, or inserting words or punctuation. In contrast, a party who seeks interpretation asks the court not to change the actual words of the document but to determine the meaning of those words. *One who asks for interpretation does not, therefore, seek replacement of any the words written in the document.* Instead, this party asserts that the words properly express the meaning which both parties understood and to which they both assented. [Emphasis added.]

Royal is not requesting this Court to determine the meaning of "RCV" or "ACV." The meanings of those acronyms are patently clear. Rather, Royal seeks to replace "RCV" with "ACV" throughout the coinsurance clause.

It is elemental that courts will not make a new contract of insurance for the parties under the guise of construing the contract." *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co*, 375 Mich 598, 602; 134 NW2d 746 (1965). Here, Royal would have this Court rewrite the coinsurance clause to state "ACV" at every instance "RCV" is stated. "Obviously the interpretation urged involves reading into the contract

raised the issue of reformation. This Court need not consider issues that have not been presented or preserved. *Caldwell v Chapman*, 240 Mich App 124, 132; 610 NW2d 264 (2000); *Booth Newspapers, Inc v Univ of Michigan Bd of Regents*, 444 Mich 211, 234, 234 n 23; 507 NW2d 422 (1993).[8]

### III. PUBLIC POLICY

Royal argues that this Court should affirm the trial court's ruling because the coinsurance clause violates Michigan public policy. We disagree.

#### A. STANDARD OF REVIEW

Whether an insurance contract violates public policy is a question of law that this Court reviews de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

#### B. ANALYSIS

"A contract that violates Michigan's public policy is unenforceable." *Pitsch v Blandford*, 264 Mich App 28, 31; 690 NW2d 120 (2004), citing *Morris & Doherty, PC v Lockwood*, 259 Mich App 38, 59-60; 672 NW2d 884 (2003), citing *Evans & Luptak, PLC v Lizza*, 251 Mich App 187, 196; 650 NW2d 364 (2002). As stated in *Terrien v Zwit*, 467 Mich 56, 66-67; 648 NW2d 602 (2002):

---

[words] not contained therein. This the Court may not do. Plaintiff's right of recovery rests on the contract as written. Under the guise of interpretation it may not be reformed or modified." *Cottrill v Michigan Hosp Service*, 359 Mich 472, 476; 102 NW2d 179 (1960).

[8] Because we conclude that the insurance policy is not ambiguous in regard to coinsurance, we need not address Royal's claim that it is entitled to have ambiguities construed in its favor pursuant to *Martin* or the rule of *contra proferentem*.

In defining "public policy," it is clear to us that this term must be more than a different nomenclature for describing the personal preferences of individual judges, for the proper exercise of the judicial power is to determine from objective legal sources what public policy *is*, and not simply assert what such policy *ought* to be on the basis of the subjective views of individual judges. This is grounded in Chief Justice Marshall's famous injunction to the bench in *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), that the duty of the judiciary is to assert what the law "is," not what it "ought" to be. [Emphasis in original.]

For this reason,

"[c]ourts must proceed with caution in determining what exactly constitutes Michigan's 'public policy,' and not merely impose its [sic] belief of what public policy should be. In other words, Michigan's 'public policy' must be clearly apparent in 'our state and federal constitutions, our statutes, and the common law,' as well as our 'administrative rules and regulations, and public rules of professional conduct[.]' " [*Pitsch, supra* at 31 quoting *Morris & Doherty, PC, supra* at 54-55 (citations omitted).]

In other words, "[t]he public policy of Michigan is not merely the equivalent of the personal preferences of a majority of this Court; rather, such a policy must ultimately be clearly rooted in the law. There is no other proper means of ascertaining what constitutes our public policy." *Terrien, supra* at 67.

"Coinsurance clauses are, generally, held enforceable in the absence of statutory prohibition to the contrary." 44 Am Jur 2d, Coinsurance Clauses, § 1499, p 770; see also anno: *Validity, construction, and effect of insurance policy provision requiring insured to maintain coverage to specified value of property (coinsurance clause)* 43 ALR3d 566, pp 569-570. No Michigan statute currently prohibits coinsurance, and our Supreme Court even "dismiss[ed] [a] plaintiff's claim that there is something

vicious about coinsurance," stating that "[i]ts legality is no longer a debatable question . . ." as it "has been authorized by law for over 40 years . . . ." *Masonic Temple Ass'n of Grand Rapids v Michigan Fire & Marine Ins Co*, 323 Mich 662, 671; 36 NW2d 317 (1949), citing *Fine Arts Corp v Kuchins Furniture Mfg Co*, 269 Mich 277; 257 NW 822 (1934). Thus, coinsurance clauses generally do not violate Michigan public policy.

Royal argues, however, that this specific coinsurance clause violates public policy because it prevents the insured from receiving the entire policy limit unless the covered property is insured for much more than the ACV of the loss. Particularly, Royal asserts that the policy is illusory,[9] because "Prime would be collecting a premium on a policy that an insured could never collect [on] by definition" as "the [ACV] will always be a significantly smaller amount than [RCV]."

Although Prime concedes that "it is unusual for a policy to base coverage and coinsurance on different property values," at least one other jurisdiction has found no disharmony within an insurance policy that measures the insurer's liability one way and the coinsurance requirement another way. *Carley Capital Group, supra* at 82 n 44. Moreover, basing coverage and coinsurance on different property values is not unprecedented in the context of commercial property insurance. See Keeton and Widiss, Insurance Law (student ed), § 3.8, p 207.

Here, nothing has been presented to clearly establish that the coinsurance clause in this case transgresses our state and federal constitutions, our statutes, the common law, our administrative rules and regulations,

---

[9] Plaintiff concedes that an insured could recover the full policy limit on the loss of a new building whose RCV has not depreciated more than 20 percent.

or our public rules of professional conduct. *Terrien,*
*supra* at 67, 67 n 11; *Pitsch, supra.* Royal essentially
argues that the insurance policy should be reformed
because it is unfair to base coinsurance liability on the
RCV of the property while allowing Prime to limit its
liability to the ACV of the loss. However, this Court
cannot rely on litigants' subjective views of fairness to
establish the public policy of this state. In sum, Royal's
public policy claim is not clearly rooted in the law,
*Terrien, supra* at 67, and because "[t]here is no other
proper means of ascertaining what constitutes our
public policy," *id.,* Royal's claim must be rejected.

Royal last argues that the coinsurance clause con-
flicts with "a public policy interest against promoting
fraudulent or deceptive practices codified in Michigan's
Uniform Trade Practices Act [MCL 500.2001 *et seq.*] as
well as the Surplus Lines [Insurance] Act [MCL
500.1901 *et seq.*] . . . ." We disagree. Because Prime is a
surplus lines carrier, its rates and forms are not subject
to the Uniform Trade Practices Act. A surplus lines
insurance carrier is not authorized to "transact insur-
ance in Michigan but [is] eligible to write insurance
business under [the Surplus Lines Insurance Act]."
MCL 500.1903(1)(a). Surplus lines insurance carriers
are only permitted to issue insurance when coverage is
unavailable from an authorized carrier. MCL
500.1910(1).

> " 'Historically, the function of surplus lines insurance
> was to provide lines of insurance that were in excess of the
> lines, or amounts of a particular line, which could be
> absorbed by the insurance companies admitted to do busi-
> ness within a state. Today it has come to mean any
> insurance placed with insurance companies not admitted
> to do business in a particular state. Non-admitted insurers
> provide valuable services in addition to their historic
> function. First, non-admitted insurers are often respon-

sible for the introduction of wholly new lines of insurance coverage in areas in which admitted companies have shown little interest. Moreover, they can write insurance risk by risk, whereas their admitted counterparts, because of the restrictions imposed by state regulation and the belief that actuarial tables based on extensive sampling are necessary, are confined to writing only class insurance. The ability to so individualize insurance coverage enables such insurers, through the use of non-standard forms, to tailor their policies to the exact needs of the insured, and also to perform a valuable service in writing deductibles. Finally, the existence of surplus lines insurers provides an escape from the rigid rate and form regulations imposed by states on admitted insurers . . . .' " [*Allen v Michigan Prop & Cas Guaranty Ass'n*, 129 Mich App 271, 277; 341 NW2d 500 (1983), quoting OAG 1979-1980, No. 5612, p 510, in turn quoting Lockwood, *Insurance—State Regulation—Surplus Lines Insurance*, 61 Mich L R 1171-1172 (1963).]

Under MCL 500.1904(1), except for rates that are unfairly discriminatory, a surplus lines insurance carrier's rates are not "subject to [the insurance] code . . ." Also, under MCL 500.1904(2), "[f]orms used by unauthorized insurers pursuant to . . . [the Surplus Lines Insurance Act] shall not be subject to [the insurance] code, except that a policy shall not contain language which misrepresents the true nature of the policy or class of policies." Thus, the coinsurance clause is not subject to the Uniform Trade Practices Act. Further, that Prime paid Royal under the property insurance policy establishes that the true nature of the policy was not misrepresented. [10] Thus, we conclude that Royal's contention that Prime's policy is violative of the Surplus Lines Insurance Act is without merit.

Moreover, we conclude that the lower court record does not reflect that Prime's business practices are

---

[10] "Nature" is defined as "[a] kind, sort, type, order; general characteristic." Black's Law Dictionary (6th ed).

fraudulent or deceptive.[11] An insured is obligated to read the insurance policy. See *Marlo Beauty Supply, Inc v Farmers Ins Group of Cos*, 227 Mich App 309, 324; 575 NW2d 324 (1998); *Parmet Homes Inc v Republic Ins Co*, 111 Mich App 140, 145; 314 NW2d 453 (1981), citing *House v Billman*, 340 Mich 621; 66 NW2d 213 (1954), and *Russel v State Farm Mut Automobile Ins Co*, 47 Mich App 677; 209 NW2d 815 (1973). Here, the coinsurance clause gives plain and unambiguous instruction on how to calculate the amount that recovery is reduced by insurance is not maintained at the specified percentage of the RCV indicated on the declarations page. As previously mentioned, the coinsurance clause provides three examples of how the clause operates, one of which specifically addresses how the coinsurance clause would operate in a case like Royal's, where the amount of the policy limit is significantly less than the coinsurance percentage of the RCV. There is no reasonable dispute that had Royal read this portion of its policy, it would have understood the extent and effect of the coinsurance clause. Given the clarity of the coinsurance clause, we cannot conclude that it was fraudulent or deceptive.

Moreover, Prime's status as a surplus lines insurance carrier supports the above conclusion that Royal is not entitled to relief on public policy grounds. Royal was not able to obtain coverage from an authorized insurer, presumably because of the high degree of risk involved in insuring the buildings. Indeed, to obtain any insurance coverage, Royal was required to go to an agent or

---

[11] Notably, the trial court dismissed with prejudice the count for fraud contained in Royal's complaint. The trial court concluded that Royal failed to show that it could reasonably have relied on Prime's alleged misrepresentations considering that Royal could have read the policy. Royal did not appeal the trial court's decision in this regard, and Royal is precluded from challenging this finding on appeal.

broker specially licensed to transact in surplus lines insurance. MCL 500.1905. Certainly, Royal must have be been aware that Prime was willing to insure against higher risks and that Prime's insurance policy would be tailored to enable it to take those higher risks. In other words, Royal should have known to pay particular attention to the policy because it was obtained through a surplus lines insurance carrier.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.